Filed 10/16/25  In re N.M. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re N.M., a Person Coming Under the Juvenile Court Law. | |
| KERN COUNTY DEPARTMENT OF HUMAN SERVICES et al. | F089390 |
| Plaintiffs and Respondents, | (Super. Ct. No. JD145887-00) |
| v. | |
| N.M., | **OPINION** |
| Appellant; | |
| ANDREA P., | |
| Defendant and Appellant. | |

## THE COURT*

APPEAL from an order of the Superior Court of Kern County.  Susan M. Gill, Judge.

Shayla Padgett-Weibel, under appointment by the Court of Appeal, for Appellant N.M.

Monica Vogelmann, under appointment by the Court of Appeal, for Defendant and Appellant Andrea P.

---

\*       Before Levy, Acting P. J., Detjen, J. and Peña, J.

David M. Yorton, under appointment by the Court of Appeal, for Respondent R.M.

Margo A. Raison, County Counsel, and Jennifer E. Feige, Deputy County Counsel, for Plaintiff and Respondent Kern County Department of Human Services.

-ooOoo-

Andrea P. (mother) and her 16-year-old son, N.M., appeal from the juvenile court's "exit order" granting sole physical custody of N.M. to his father, R.M. (father), following a Welfare and Institutions Code[1] section 364 review hearing.

Mother argues that the order was an abuse of discretion because it was contrary to N.M.'s express wishes to be placed with mother, and N.M. was of an age and ability to form an intelligent preference of where he wanted to live. N.M. joins in mother's arguments.

We find no abuse of discretion and affirm the juvenile court's order.

## FACTUAL AND PROCEDURAL BACKGROUND

On February 23, 2024, a juvenile dependency petition was filed in Los Angeles County alleging that then 14-year-old twins, N.M. and C.M., came within the juvenile court's jurisdiction under section 300, subdivisions (a) (nonaccidental serious physical harm) and (b) (failure to protect), and that C.M. additionally came under the court's jurisdiction under section 300, subdivision (j) (abuse of sibling).[2] The petition alleged that in February 2024, mother had struck N.M. in the face with a closed fist and repeatedly struck him in the chest, causing bruising. It was further alleged she had struck him on previous occasions to the point of causing bruising, and N.M. was refusing to live

---

[1]    All further undesignated statutory references are to the Welfare and Institutions Code.

[2]    C.M. is not a subject of or party to this appeal, but we include facts pertaining to him to the extent they are relevant to understanding the case and/or the issues on appeal.

2.

with her because of the continued physical abuse. It was also alleged the abuse placed N.M. as well as C.M. at risk of serious physical harm.

The initial investigation of the Los Angeles County Department of Children and Family Services (LADCFS) leading to the petition revealed that N.M. had reported the recent incident of abuse to his football coach and stated the abuse had been going on for about a year. N.M. reported he did not feel safe and did not want to return home. He stayed with his maternal aunt while LADCFS conducted its investigation, and during that stay, he told the maternal aunt he was afraid mother would continue to physically abuse him.

Mother reported to the investigating social worker that she had been having problems with N.M. lying about having a girlfriend, and on the day of the incident, she learned he had missed school assignments. When she confronted him about it, he "puffed up his chest," and she felt he was trying to intimidate her. She stuck out her open hand to block N.M. and denied causing any bruising. She denied any physical or verbal abuse but admitted to making "strong statements" toward both children.

N.M.'s adult sibling reported that she had also suffered physical abuse by mother when she was N.M. and C.M.'s age. She stated that mother did not physically abuse C.M. but was verbally abusive toward him. Another of N.M.'s adult siblings who lived in the home with mother and the children reported she witnessed the abuse of N.M. but was afraid that if she intervened, mother would kick her out of the house. She further reported that N.M. was mother's " 'punching bag' " and that C.M. was her " 'golden child.' " She had taken photographs of N.M. after mother hit him, showing the bruising mother caused.

LADCFS detained the children from mother and released them to father, who lived in Kern County and had weekend visitation with the children. Father needed some time to obtain a larger residence, so he arranged for the maternal aunt to continue caring for them in the meantime. N.M. was hesitant about living with father because of the

distance and because he wanted to remain at his school with his friends and football team. N.M. wanted to stay with the maternal aunt but did not want to return home or be required to see mother.

At the initial hearing, N.M. was present and, through counsel, requested to be placed with the maternal aunt and be able to finish his school year. Both parents wanted him released to father. The juvenile court concluded, "I really don't have a basis to detain from father. I do want to give [N.M.] agency, but I—my hands are kind of tied here." The court detained the children from mother and released them to father. The court ordered mother to have unmonitored visitation with C.M. and monitored visitation with N.M., with LADCFS having discretion to liberalize visits.

In March 2024, N.M. reported he liked living with father and had made the football team at his new school. According to N.M., father's house was " 'calm,' " and he was working on building his relationship with father since he had only seen him on weekends in the past. N.M. further reported he was not afraid of mother at that moment but was afraid of her when he lived with her. He would like to return to her care in the future, but was worried that she would hold his reporting the abuse against him. He reported he felt "much" safer in father's care, explaining, "I'm able to come home, not get judged and I can be me."

Mother reported in March 2024 that N.M. was not allowed to come back and that she wanted him to stay with father. She had completed an online anger management class and had enrolled in a 12-hour online parenting class. Mother had not visited with the children by that point because she wanted to give N.M. a break.

At the adjudication hearing conducted on April 18, 2024, the juvenile court sustained the dependency petition. As to disposition, the children's attorneys requested the case remain open, and N.M. wanted overnight visits with maternal aunt. The court adjudged the children dependents; removed them from mother's custody, finding she posed a substantial danger to their health and safety; released them to father; and ordered

4.

jurisdiction was to remain open for six months given the children's requests. The court ordered LADCFS to assess overnight or weekend visits with maternal aunt. The court granted mother family enhancement services, to include anger management and parenting courses, and individual counseling. The court ordered her to have monitored visitation with both children.

The case was subsequently transferred to Kern County. In the transfer-in report prepared by the Kern County Department of Human Services (KDHS), it was reported the children were doing well and were visiting with mother for six hours on Sundays, and the visits were supervised by the maternal grandmother. The Kern County Juvenile Court accepted transfer and set a section 364 review hearing for October 2024.

Mother subsequently reported to KDHS that she was working on parenting classes and receiving mental health services. N.M. continued visiting with mother. C.M. stopped visiting with mother in June and July 2024 but began visiting with her again in September. Both parents reported that the visits sometimes ended early or did not occur; father reported mother canceled visits at the last minute, and mother reported father sometimes made the children leave early or failed to transport them.

In September 2024, N.M. was suspended from football for a set number of games because he had stolen alcohol from a gas station with friends. No charges were filed. KDHS opined father disciplined N.M. in an "appropriate" manner for this behavior by grounding N.M. and having him write a letter of why what he did was wrong and what could have been done better.

KDHS reported that the children were doing well in father's home and were adjusting to their new school. The home was free from safety hazards, and father was attending to the children's needs. KDHS recommended that jurisdiction be terminated and father be awarded sole physical custody.

At the section 364 review hearing conducted on October 17, 2024, the children's attorney informed the juvenile court that N.M. wanted to return to mother, and C.M.

wanted to remain with father. He represented both would be okay with that arrangement, and they each wanted visitation with the other parent. The matter was continued for further evaluation as to mother's efforts at reunification.

Following the hearing, N.M. reported school was going well. He was playing football and working on bringing his grades up. Both children reported visits with mother were going well.

In November 2024, mother reported completing an online 12-hour parenting class and that she was continuing to attend therapy and provided documentation to the social worker. N.M. continued to report visits with mother were going well; he visited with her once or twice a month, and he wanted to live with her because he missed his friends, old school, and family. Father expressed concern to the social worker about N.M.'s reasons he wanted to live with mother and felt the reason he wanted to move back with her was because she provided less supervision than father did. Both children stated they were doing well living with father, and N.M. reported feeling safe and comfortable and that he was eating and sleeping well.

In December 2024, the maternal grandmother, who supervised the visits, reported the visits were going well. N.M. and mother talked about future plans and other topics, and N.M. seemed excited about moving back with mother. Mother reported the visits were going well and that her and N.M.'s relationship had improved. They had good communication and had agreed to start family therapy if he returned to her home. She said that if any issues were to arise, she would call her therapist, and they would work out their issues in therapy. She planned to use simple commands and positive redirection. In therapy, she had learned to manage her anger and not yell, and she planned to continue going to therapy. When asked why she thought C.M. did not always want to visit, she responded she felt it was because father spoke ill about her.

In its supplemental review report, KDHS opined that mother had made moderate progress in mitigating the circumstances which led to the dependency through her

services.  Though N.M. reported wanting to live with her, KDHS did not recommend she be awarded physical custody, as he was doing well in father's care and KDHS was "not able to determine at this time whether the mother is ready to have the child she perpetrated physical abuse on back in her custody," noting that she had only completed four hours of anger management services at that point and KDHS was not able to schedule a home inspection with her.  KDHS again recommended dependency be dismissed, that father be awarded sole physical custody of the children, and that both parents be awarded joint legal custody.

A continued section 364 review hearing was conducted on December 16, 2024, at which mother and minors' counsel set the matter for contest with regard to the recommendation that father be granted physical custody of N.M.  The matter was continued.  It was later reported that N.M. thought he was going home with mother after the hearing and had packed up his room.  N.M. was upset but talked it through with father.  He continued to report feeling safe with father but that he wanted to live with mother.

The contested hearing as to the recommendation regarding N.M. was conducted on January 30, 2025.  Mother testified that she had completed a four-hour anger management class and an additional 16-hour anger management class.  The classes helped her understand how her actions and reactions affect her children, and she had learned practical strategies to manage her emotions and communicate more effectively. She continued doing weekly therapy and had learned a lot of de-escalation strategies and how to implement and maintain boundaries and manage the household.  Her proposed custody arrangement was to have N.M. live with her and C.M. live with father, and the children could switch households for visitation with the other parent.

The juvenile court questioned mother about what prompted the "severe beating" she perpetrated on N.M., and she responded that N.M. "had chosen to make some decisions with promiscuity on campus at school that happened over a dozen times."  She

later stated that what she did was "not appropriate" and "completely wrong" and apologized to N.M. Mother maintained it was a one-time incident. When the court asked what she would do if N.M. behaved in the same way again, mother responded that she knew it was inappropriate and that there would not be a next time. She also explained that she did not "beat" N.M., rather she "la[id her] hands on him" and just wanted him to listen. She knew it was not an appropriate way to communicate. She later explained that if N.M. were to act out against her again, she would contact father "and try to collectively come together to coparent to figure out a tangible solution." She subsequently added that if she could not reach father, she would "remain calm and instead of reacting angrily or matching the tone of any child, [she] would take a deep breath, keep [her] voice calm and just remind [her]self that escalating will only make things worse."

Father testified N.M. had seen mother about twice per month over the last six months, and there had been no visits in the last month. N.M. had friends in Kern County, and usually one or two stayed over on weekends. Father was concerned about mother's proposed visitation schedule because the children would not see each other and it would interfere with their special twin bond.

Father further testified he believed it would be detrimental for N.M. to visit with mother alone without C.M. due to her temper. Father stated he had seen mother's temper, and it was not "a one time thing."

KDHS submitted on its report and recommendations and argued the proposed custody order was the most appropriate, and in the children's best interests. Father's counsel joined in KDHS's recommendations.

Mother's counsel asked that mother be granted sole physical custody of N.M., with father to have regular visitation with an arrangement where N.M. and C.M. would still see each other.

Minors' counsel also asked for N.M. to be placed with mother. He stated, "[w]ith regard to … mother, I'm not without concerns," noting the reports indicated mother had

shown a pattern of abusive behavior. Counsel went on to say that mother had completed a case plan and though he "d[id not] trust everything that she says," he "believe[d] that she's learned and … engaged in rehabilitation." Finally, he explained that he believed N.M. was smart enough to "understand exactly what's going on," and was also old enough "to self report, if he does find himself in any sort of danger."

In beginning its ruling, the juvenile court acknowledged the work mother had done but noted she was "able to speak very well in generalities" but "falls a little short when it comes to specifics, in terms of what would she do if this happened again," adding "she finally said, well, she'd call the father." The court went on to explain that its order would "recognize[] that she has done this work." The court commented that mother lacked credibility in testifying that father had not helped with the children before they were removed and that she showed "a lack of understanding" by being willing to split the children up because she thought it was in their best interests. The court went on to say that "for all the work [mother]'s done, she's testifying that she understands now that you can't behave the way she did. Well, presumably, she understood that before and just lost control. Because I don't think anybody thinks it would be okay to treat [N.M.] the way she treated [N.M.]. So that was a bit of a disconnect."

The juvenile court followed KDHS's recommendations. The court awarded the parents joint legal custody and father sole physical custody of the children, with mother to have visitation every other weekend.

## DISCUSSION

If the juvenile court terminates its jurisdiction over a dependent child, it may issue an order determining the custody of, or visitation with, the child. (§ 362.4, subd. (a).) In making an order under section 362.4, subdivision (a) or "exit order," the juvenile court's primary consideration is the best interests of the child. (*In re J.M.* (2023) 89 Cal.App.5th 95, 112.) In determining what is in the child's best interests, the court must consider the totality of the circumstances. (*In re Chantal S.* (1996) 13 Cal.4th 196, 201.) The best

9.

interests of the child standard " 'is an elusive guideline that belies rigid definition. Its purpose is to maximize a child's opportunity to develop into a stable, well-adjusted adult.' " (*In re Ethan N.* (2004) 122 Cal.App.4th 55, 66.) "In any custody determination, a primary consideration in determining the child's best interests is the goal of assuring stability and continuity." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.)

Because juvenile dependency proceedings arise when children are subject to or at risk of abuse or neglect, custody orders are not made "until the child has been declared a dependent of the court and in many cases, such as this one, the child has been removed from the parents upon clear and convincing evidence of danger. The issue of the parents' ability to protect and care for the child is the central issue[, and t]he presumption of parental fitness that underlies custody law in the family court just does not apply to dependency cases." (*In re Jennifer R.* (1993) 14 Cal.App.4th 704, 712; accord, *In re Chantal S.*, *supra*, 13 Cal.4th at p. 206.) "Rather the juvenile court, which has been intimately involved in the protection of the child, is best situated to make custody determinations based on the best interests of the child without any preferences or presumptions." (*In re Jennifer R.*, at p. 712.)

The juvenile court has "broad discretion" to make exit orders. (*In re Nicholas H.* (2003) 112 Cal.App.4th 251, 265, fn. 4.) We review the court's order for abuse of discretion and "may not disturb the order unless the court ' " 'exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300.) We look at whether, in light of the record, the court's ruling falls within the permissible range of options set by the legal criteria. (*Pack v. Kings County Human Services Agency* (2001) 89 Cal.App.4th 821, 838.)

Mother, joined by N.M., argues the juvenile court abused its discretion by not ordering N.M. to be placed with her because it was contrary to his express wishes. Mother recognizes that a court is not bound by a child's wishes but argues that the court

must give special weight to a child's wishes when they are of an age and ability to form an intelligent preference when it is determining the child's best interests in terms of custody and visitation orders.

Mother correctly sets forth the law. (See *Guardianship of Saul H.* (2022) 13 Cal.5th 827, 854 [standing for the above proposition]; see also *In re Aljamie D.* (2000) 84 Cal.App.4th 424, 432 [child's placement preference, while "not determinative" can constitute evidence of what is in her best interests]; Fam. Code, § 3042, subd. (a) ["If a child is of sufficient age and capacity to reason so as to form an intelligent preference as to custody or visitation, the court shall consider, and give due weight to, the wishes of the child in making an order granting or modifying custody or visitation."].)

Mother does not, however, persuade us that the juvenile court here did not give due weight to N.M.'s preference nor that its exit order was an abuse of discretion. N.M.'s wishes were made clear at the hearing, and there is no evidence the court did not consider them or give them due weight. Given the totality of the circumstances, the court could have reasonably determined placement with father and C.M. was in his best interests despite N.M.'s wish to live with mother. N.M. had suffered physical abuse at the hands of mother, leading to a substantial danger finding, and at the outset of the case was adamant that he feared her and did not want to live with her. As the court pointed out, mother had engaged in some services and appeared to have made progress, and we are pleased to see that mother and N.M. appear to have forged a positive visiting relationship over the course of the proceedings. However, the court's concerns about mother's ability to refrain from future inappropriate behavior if given sole physical custody of N.M. were reasonable given that mother and N.M. had not progressed to longer, more frequent, or unsupervised visits, as well as her testimony at the hearing. Indeed, when asked about the primary incident that led to the dependency proceedings, mother began talking about N.M.'s behavior rather than her own, was not able to articulate clear steps on how she would handle future conflict or discipline besides calling

11.

father, and downplayed the extent of the abuse by stating it had only happened one time, when evidence on the record supported it was ongoing for at least a year.

As to N.M.'s wishes, the juvenile court likely appropriately evaluated them in the context of his limited interactions with mother; while N.M. may have wanted to live with mother based on positive interactions he had with her during visitation, the visits were in a supervised setting, and he saw her relatively infrequently. In contrast, the last time N.M. lived with mother, he was victim to physical abuse. Again, we recognize mother has made efforts to work on issues underlying the physical abuse, but the court could have reasonably considered the lack of evidence regarding how mother and N.M. would interact in an unsupervised day-to-day full-time setting in determining how much weight to give N.M.'s wish to live with mother. Thus, even though N.M. was an older child, the court could have concluded his wishes were not entitled to determinative weight given that they were not informed by what life with mother would be like in such a setting.

Further, while it is clear N.M. wished to live with mother and missed his life in Los Angeles County, there was no evidence he was not doing generally well in father's care. He expressed no strong objections to living with father despite his preference to live with mother and consistently reported feeling safe. He played football, had friends, and was working on improving in school.

For the above reasons, we cannot say the juvenile court's order was arbitrary, capricious, or patently absurd.

We find no error.

## DISPOSITION

The juvenile court's January 30, 2025 order is affirmed.